**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE EMPLOYEES'
RETIREMENT SYSTEM OF THE
CITY OF MONTGOMERY, on
behalf of itself and all others
similarly situated,
     Plaintiff,
       v.
JPMORGAN CHASE BANK, N.A.
and SIMPSON THACHER &
BARTLETT LLP,
     Defendants.

Case No. 15-6002

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................3

PARTIES...............................................................................................3

JURISDICTION AND VENUE ..............................................................4

STATEMENT OF FACTS .....................................................................5

   A.   The Negligence and Gross Negligence of the Defendants Which
Resulted in the Loss of the Security Interest of the Term Loan in General
Motors' Property…………………………………………………………….…..5

   B.   The Discovery of the Filing of the Term Loan UCC-3, and
JPMorgan's Concealment Thereof from the Plaintiff and the Other Term Loan
Participants…………..……………………………………………………......14

THE CLAIMS ASSERTED HEREIN HAVE BEEN TIMELY
FILED…………………………………………………………...………...   26

CLASS ALLEGATIONS ......................................................................32

CLAIMS FOR RELIEF

COUNT I – BREACH OF CONTRACT AGAINST JPMORGAN ......................36

COUNT II – GROSS NEGLIGENCE AGAINST JPMORGAN ..........................39

COUNT III – FRAUDULENT CONCEALMENT AGAINST JPMORGAN .......43

COUNT IV – DECLARATORY RELIEF AGAINST JPMORGAN AS TO
JPMORGAN'S COMMON LAW INDEMNIFICATION OBLIGATIONS..........47

COUNT V – PROFESSIONAL MALPRACTICE AND NEGLIGENCE
AGAINST SIMPSON THACHER.........................................................49

COUNT VI – NEGLIGENT MISREPRESENTATION AGAINST SIMPSON
THACHER.............................................................................................51

PRAYERS FOR RELIEF .......................................................................53

## INTRODUCTION

1.     This is an action brought by the Employees' Retirement System of the City of Montgomery on behalf of a Class of entities that were participants in a General Motors Term Loan.  Montgomery brings this action against the Defendants JPMorgan Chase, N.A. and Simpson Thacher and Bartlett LLP to recover damages caused to Montgomery and the members of the Class resulting from the loss of the security interest on the collateral that General Motors had provided for the Term Loan.  That security interest was lost due to JPMorgan's breach of contract and gross negligence and the negligence and gross negligence and negligent misrepresentations of Simpson Thacher, as explained in detail herein.

## PARTIES

2.     Plaintiff, the Employees' Retirement System of the City of Montgomery ("Plaintiff" or "Montgomery"), is an unincorporated association established under the laws of the State of Alabama.  It is located in Montgomery, Alabama.   Montgomery administers retirement benefits for city and airport authority employees of the City of Montgomery, Alabama. Montgomery was participant in the General Motors Term Loan and received a May 2015 interest

payment, and a July 2015 principal and interest payment, which are both subject to a claw-back action discussed more fully below.

3.     JPMorgan Chase Bank, N.A. ("JPMorgan") is a national banking association that is a principal bank subsidiary of JPMorgan Chase & Co. JPMorgan's headquarters and principal place of business is at 270 Park Avenue, New York, NY 10017.

4.     Simpson Thacher & Bartlett LLP ("Simpson Thacher") is a limited liability partnership and law firm established under the laws of the State of New York.  Simpson Thacher is headquartered and has its principal place of business at 425 Lexington Avenue, New York, NY 10017.

5.     The Defendants JPMorgan and Simpson Thacher are sometimes collectively referred to herein as the "Defendants."

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed Class; (2) the putative Class consists of hundreds of proposed Class members; (3) the citizenship of at least one Class member is different from the Defendants' citizenship; and (4) the aggregate amount in controversy by the claims of Plaintiff and the putative Class exceeds $5,000,000, exclusive of interest and costs.

7.    This Court has personal jurisdiction over Defendants because the Defendants regularly do business in New York, are headquartered and/or have a principal place of business in New York and/or have been established under the laws of the State of New York.

8.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants are each subject to personal jurisdiction in this District, and Defendants are headquartered and/or have a principal place of business in this District.  Defendants also regularly do business in this District.

## STATEMENT OF FACTS

**A.    The Negligence and Gross Negligence of the Defendants Which Resulted in the Loss of the Security Interest of the Term Loan in General Motors' Property**

9.    In 2008, prior to its 2009 bankruptcy filing, General Motors Corporation ("General Motors") had two unrelated outstanding borrowings.  One was a 2001 secured borrowing structured as a synthetic lease (the "Synthetic Lease") and the other was an unrelated 2006 secured term loan (the "Term Loan"). The two borrowings were syndicated with different syndicates of lenders. The Plaintiff and all members of the putative Class were participants in the Term Loan syndication.

10.    The Synthetic Lease and the Term Loan were each secured by different, unrelated assets of General Motors.

5

11.     JPMorgan was the Administrative Agent and secured party of record for the lenders for both the Synthetic Lease and the Term Loan.

12.     The terms of the Term Loan were set forth in a Term Loan Agreement, dated as of November 29, 2006, among, *inter alia*, General Motors, as Borrower, Saturn Corporation ("Saturn"), as Guarantor, JPMorgan, as Administrative Agent, and various lenders (the "Term Loan Agreement").

13.     The security interest in substantially all of the collateral for the Term Loan was recorded in a UCC-1 financing statement filed in 2006 with the Delaware Department of State, bearing the number 6416808 4 (the "2006 Main Term Loan UCC-1").   The 2006 Main Term Loan UCC-1 provided that the security interest for the Term Loan was held by JPMorgan, as Administrative Agent for the lenders on the Term Loan.

14.     The Term Loan was syndicated to over 400 Lenders.   At relevant times, the Plaintiff and the members of the Class held an interest in the Term Loan syndication.

15.     The terms of the Synthetic Lease were set forth in a Participation Agreement ("Participation Agreement"), dated as of October 31, 2001, among, *inter alia*, General Motors, JPMorgan, as Administrative Agent, and various lenders.   GM's obligation to repay the Synthetic Lease was secured by liens on

certain real property identified in the Participation Agreement and related Synthetic Lease documents.

16.     In order to perfect security interests in the collateral securing the Synthetic Lease, UCC-1 financing statements were filed in various counties in which the assets were located.  The security interest for the Synthetic Lease was recorded in UCC-1 statements filed in 2001 with the Delaware Department of State, which bore numbers 2092532 5 and 2092526 7.

17.     Those UCC-1 statements provided that the security interest for the Synthetic Lease was held by JPMorgan, as Administrative Agent for the lenders on the Synthetic Lease.

18.     In September 2008, General Motors began the process of paying off the Synthetic Lease, which was nearing maturity.  General Motors had no intention at that time to take any action with respect to the Term Loan. General Motors instructed its counsel, Mayer Brown LLP ("Mayer Brown"), to prepare the necessary documents to effect its payoff of the Synthetic Lease and the corresponding release of the security interests on General Motors property held by JPMorgan, as agent for the Synthetic Lease lenders.  The payoff documentation would include UCC-3 termination statements to be filed with the Delaware Department of State that would terminate the security interest in the GM property

that secured the Synthetic Lease as recorded in the UCC-1 statements filed in 2001.

19.     Mayer Brown, acting at all times through its authorized partners, associate attorneys and employees located in Chicago, Illinois, prepared those closing documents.

20.     Specifically,

> The Mayer Brown associate prepared a closing checklist that included several dozen actions and documents required to unwind the Synthetic Lease. Among the items on the Closing Checklist was a list of security interests held by General Motors' lenders that would need to be terminated. To prepare the list of security interests, the associate asked a paralegal, unfamiliar with the transaction or the purpose of the request, to perform a search for UCC-1 financing statements that had been recorded against General Motors in Delaware. The paralegal's search identified three UCC-1s, numbered 2092532 5, 2092526 7, and 6416808 4. Neither the paralegal nor the associate realized that only two of the UCC-1s were related to the Synthetic Lease transaction. The third UCC-1, number 6416808 4, related to the 2006 Main Term Loan UCC-1. Not noticing that one of the UCC-1s was unrelated to the Synthetic Lease, the associate placed all three for termination in the Closing Checklist:

> Termination of UCCs (central, DE filings) Blanket-type financing statements as to real property and related collateral located in Marion County, Indiana (file number 2092532 5, file date 4/12/02 and file number 2092526 7, file date 4/12/02) financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06)

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.),* 755 F.3d 78, 80 (2d Cir. 2014).

21.    Mayer Brown created, and included within the closing documents for the Synthetic Lease, a UCC-3 termination statement that bore the number of the 2006 Main Term Loan UCC-1 - 6416808 4.  Accordingly, on its face, that UCC-3, if filed with the Delaware Department of State, would release the security interest held by JPMorgan as secured party of record on the Term Loan, which security interest was recorded with the Delaware Department of State by the 2006 Main Term Loan UCC-1 numbered 6416808 4. The Term Loan, however, was still outstanding; it was not being repaid by General Motors; and there was no basis or reason to release the security interest on the collateral for the Term Loan.

22.    Mayer Brown sent the closing documents for the Synthetic Lease which it had prepared to Simpson Thacher, counsel to JPMorgan with respect to the Synthetic Lease, with the knowledge, intent and express expectation that Simpson Thacher would provide the closing documents to JPMorgan, and specifically to Richard W. Duker ("Duker") who was, at all times relevant hereto, a Managing Director of JPMorgan.

23.    Duker had primary responsibility at JPMorgan for its relationship with General Motors. Duker was directly and primarily responsible for JPMorgan's involvement with both the Synthetic Lease and the Term Loan at the time each of

those loans was consummated and at all relevant times thereafter. Duker was the individual at JPMorgan with the primary and ultimate authority and responsibility for JPMorgan's performance of its duties, tasks and responsibilities as Administrative Agent for both the Synthetic Loan and the Term Loan, and was highly familiar with both the Synthetic Loan and the Term Loan.  Duker was highly experienced in secured transactions and fully understood how security interests were created and recorded by the filing of UCC-1 statements and how they were terminated by the filing of UCC-3 termination statements.

24.     Among the closing documents that Mayer Brown sent to Simpson Thacher, and which Simpson Thacher sent to JPMorgan and Duker, were:

   a. the closing checklist which negligently misrepresented that the UCC-1 which bore file number 6416808 4 (file date 11/30/06) was one of the liens that was associated with and needed to be terminated in connection with the repayment of the Synthetic Lease, and

   b. the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the Term Loan, pursuant to the 2006 Main Term Loan UCC-1.

25.     Simpson Thacher, acting at all times through its authorized attorneys and employees, including Mardi Merjian, who was of counsel to Simpson Thacher, negligently and grossly negligently approved the closing documents prepared by

10

and submitted to it by Mayer Brown, including the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the Term Loan, pursuant to the 2006 Main Term Loan UCC-1.

26.     On October 15, 2008, the Mayer Brown associate e-mailed all three draft UCC-3s to Simpson Thacher, along with the Termination Agreement and a copy of the Closing Checklist. Simpson Thacher attorney Mardi Merjian responded two days later as follows: "Nice job on the documents. My only comment, unless I am missing something, is that all references to JPMorgan Chase Bank, as Administrative Agent for the Investors should not include the reference 'for the Investors.'" *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 81 (2d Cir. 2014).

27.     Simpson Thacher knew from the draft UCC-3 which its attorneys reviewed that with respect to UCC-1 numbered 6416808 4, JPMorgan, as Secured Party, was acting as Administrative Agent for a syndicate of lenders.

28.     Mayer Brown also prepared an Escrow Agreement:

... that instructed the parties' escrow agent how to proceed with the closing. Among other things, the Escrow Agreement specified that the parties would deliver to the escrow agent the set of three UCC-3 termination statements (individually identified by UCC-1 financing statement filing number) that would be filed to terminate the security interests that General Motors' Synthetic Lease lenders held in its

properties. The Escrow Agreement provided that once General Motors repaid the amount due on the Synthetic Lease, the escrow agent would forward copies of the UCC-3 termination statements to General Motors' counsel for filing. When Mayer Brown e-mailed a draft of the Escrow Agreement to JPMorgan's counsel for review, the same Simpson Thacher attorney responded that "it was fine" and signed the agreement.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

29.    JPMorgan, at all times acting through its authorized officers, directors, and employees, including Duker, approved the closing documents and Escrow Agreement prepared by and submitted to it by Mayer Brown, including the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the Term Loan, pursuant to the 2006 Main Term Loan UCC-1. In doing so, JPMorgan was reckless, was grossly negligent, and was acting outside the scope of its authority under the Term Loan Agreement.

30.    JPMorgan, at all times acting through its authorized officers, directors, and employees, including Duker, expressly authorized Mayer Brown to file with the Delaware Department of State the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the Term Loan, pursuant to the 2006 Main

Term Loan UCC-1. In doing so, JPMorgan was reckless, was grossly negligent, and was acting outside the scope of its authority under the Term Loan Agreement.

31.    On or about October 30, 2008, pursuant to JPMorgan's express authorization, Mayer Brown caused the UCC-3 statement that bore the number 6416808 4 to be filed with the Delaware Department of State. (That UCC-3 statement is hereafter sometimes referred to as the "Main Term Loan UCC-3".)

32.    Pursuant to Section 10.01(vii) of the Term Loan Agreement, JPMorgan was prohibited from releasing "all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender."

33.    By authorizing the filing of the Main Term Loan UCC-3, JPMorgan released substantially "all of the Collateral from the Liens of the Security Documents without the written consent of each Lender." In doing so, JPMorgan breached Section 10.01(vii) of the Term Loan Agreement and violated its duties as an agent to only act within the scope of its actual authority and to comply with the Lenders' lawful instructions.

34.    JPMorgan's counsel for the Term Loan were the law firms Cravath, Swaine & Moore LLP ("Cravath") and Morgan Lewis & Bockius LLP ("Morgan Lewis"). JPMorgan neither sought, nor received, nor relied upon any legal advice from either Cravath or Morgan Lewis concerning the UCC-3 statement that bore

the number 6416808 4 before authorizing the filing of that UCC-3 with the Delaware Department of State.

35.    As a direct and proximate result of JPMorgan's breach of contract and gross negligence, the Main Term Loan UCC-3 was filed with the Delaware Department of State on October 30, 2008.

36.    As a direct and proximate result of the negligence and gross negligence and negligent misrepresentations of Simpson Thacher, the Main Term Loan UCC-3 was filed with the Delaware Department of State on October 30, 2008.

37.    As described below, on January 21, 2015, the United States Court of Appeals for the Second Circuit held that the filing of the Main Term Loan UCC-3 numbered 6416808 4 terminated the Term Loan security interest in General Motors' property that had been previously recorded by the 2006 Main Term Loan UCC-1 numbered 6416808 4. *Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100 (2d Cir. 2015).

**B.    The Discovery of the Filing of the Main Term Loan UCC-3, and JPMorgan's Concealment Thereof from the Plaintiff and the Other Term Loan Participants**

38.    Between October 30, 2008 and June 1, 2009, General Motors continued to treat JPMorgan and the Term Loan participants, in all respects, as

fully perfected secured parties under the Term Loan Agreement, which included the issuance of collateral value certificates on December 2, 2008, March 23, 2009 and on the eve of the bankruptcy, on May 28, 2009.

39.    On June 1, 2009, General Motors filed for protection under Ch. 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

40.    Sometime in the middle of June 2009, attorneys at Morgan Lewis, counsel for JPMorgan in connection with the General Motors bankruptcy and in connection with the Term Loan, discovered that the Main Term Loan UCC-3 had been filed with the Delaware Department of State in October 2008.

41.    Shortly thereafter JPMorgan and/or Morgan Lewis informed the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "Creditors Committee") of the filing of the Main Term Loan UCC-3.

42.    However, JPMorgan did not inform the Plaintiff or, on information and belief, the other Term Loan participants that the Main Term Loan UCC-3 had been filed, either in June 2009 or at any other time thereafter.

43.    On June 25, 2009, the Bankruptcy Court entered a Debtor-In-Possession ("DIP Order"), which authorized and instructed the debtor, General Motors, to pay JPMorgan, on behalf of all of the Term Loan participants, 100% of

the principal and interest due on the Term Loan, within three days of the DIP Order. General Motors made that payment to JPMorgan, and in early July 2009, JPMorgan paid the Plaintiff, and on information and belief, all the participants in the Term Loan, the principal amount and interest due on the Term Loan.

44. JPMorgan distributed 100% of the principal and interest due on the Term Loan to the Plaintiff and the other Term Loan participants in early July 2009. When it did so, JPMorgan did not inform the Plaintiff or the other Term Loan participants:

a. that the Main Term Loan UCC-3 had been filed with the Delaware Department of State;

b. that the security interest in the collateral could be, and in all likelihood would be, challenged by the Creditors Committee;

c. that as a result of the challenge it may be determined that the security interest had been terminated; and

d. that the Plaintiff and the other Term Loan participants might be required to pay back the funds being distributed to them.

45. The DIP Order authorized the Creditor's Committee to bring any claim with respect to or challenge to the perfection of first priority liens of any of the Prepetition Senior Facilities Secured Parties, as defined in the DIP order, by filing adversary proceedings in the Bankruptcy Court on or before July 31, 2009.

16

46.     The Term Loan was a Prepetition Senior Facility and JPMorgan (as Administrative Agent for the Term Loan and as the secured entity of interest for the Term Loan collateral), the Plaintiff and the other Term Loan participants were Prepetition Senior Facilities Secured Parties as defined in the DIP order.

47.     On July 31, 2009, the Creditors Committee initiated an Adversary Proceeding (No. 09-00504 (REG)) in the General Motors Bankruptcy (the "Adversary Proceeding"). The defendants in the Adversary Proceeding were JPMorgan, the Plaintiff, and all of the other Term Loan participants that had received interest payments on the Term Loan from General Motors in May 2009 and/or had received the above described principal and interest payments in July 2009, pursuant to the DIP order.

48.     In its Adversary Complaint, the Creditors Committee asserted that the security interest in the debtor's property that had been recorded by the 2006 Main Term Loan UCC-1 numbered 6416808 4 had been terminated by the October 2008 filing of the Main Term Loan UCC-3 also bearing the number 6416808 4.

49.     Neither the Plaintiff nor any of the other participants in the Term Loan were served with process in the Adversary Proceeding until May 2015, as described below. Only JPMorgan was served with such process in 2009.

50.     After the Adversary Proceeding had been initiated by the Creditors Committee, on July 31, 2009, JPMorgan took affirmative steps to prevent the

17

Plaintiff and the other participants in the Term Loan from learning that the Adversary Proceeding had been filed.  This also had the intent and effect of preventing the Plaintiff and the other participants in the Term Loan from learning that the Main Term Loan UCC-3 had been filed due to the misconduct of JPMorgan and the other Defendants, as alleged herein.

51.    JPMorgan entered into Stipulations with the Creditors Committee in the Adversary Proceeding which provided that service of process upon the Plaintiff and the other Term Loan participants would be deferred until a final determination in the Adversary Proceeding whether the filing of the Main Term Loan UCC-3 with the Delaware Department of State had terminated the security interest of the Term Loan.  Specifically,

a. By Stipulation dated October 6, 2009 between JPMorgan and the Creditors Committee, JPMorgan accepted service of the Adversary Complaint.  The Stipulation recognized that the other defendants had not been served and further provided:  "The Committee shall have 240 days to complete service on the other defendants, without prejudice to seek an additional extension of time to serve the summons and Complaint upon other defendants, if necessary."

b. By Stipulation dated January 20, 2010, JPMorgan and the Creditors Committee agreed to modify the October 6, 2009 stipulation to

18

provide that: "The Committee shall have until thirty (30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."

c. On March 25, 2013, JPMorgan and the Creditors Committee filed a Proposed Order in the Adversary Proceeding "that the time by which Plaintiff shall serve the Summons and Complaint upon the Other Defendants is extended to thirty (30) days after the date of entry of a Final Order [by the Bankruptcy Court, after appeals thereof], without prejudice to the right of Plaintiff to seek additional extensions thereof." The Proposed Order was entered by the Bankruptcy Court on April 10, 2013.

52.   By entering to the aforesaid agreements and stipulations, JPMorgan intentionally concealed from the Plaintiff and the other Term Loan participants that it had authorized the filing of the Main Term Loan UCC-3 with the Delaware Department of State, which on its face released the security interest in the collateral securing the Term Loan which had been effected by the 2006 Main Term Loan UCC-1.

53.   By entering to the stipulations to defer service of the Summons and Complaint on the Term Loan participants, JPMorgan intentionally concealed from

the Plaintiff and the other participants in the Term Loan that the Creditors Committee was asserting in the Adversary Proceeding that the filing of the Main Term Loan UCC-3 had terminated the security interest on most of the collateral for the Term Loan.

54.     Pursuant to Article VII(g) of the Term Loan Agreement, there is an Event of Default if "any of the Security Documents shall cease, for any reason, to be in full force and effect with respect to Collateral with a book value in excess of $25,000,000 in the aggregate, <u>or any Loan Party or any Affiliate of any Loan Party shall so assert</u>, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby." (Emphasis added).

55.     The 2006 Main Term Loan UCC-1 was one of the "Security Documents" as that term is defined and used in the Term Loan Agreement.

56.     General Motors was one of the "Loan Parties" as that term is defined and used in the Term Loan agreement.

57.     The Creditors Committee was an "Affiliate" of a Loan Party as that term is defined and used in the Term Loan Agreement.

58.     The Creditors Committee's filing of the Adversary Proceeding on July 31, 2009 constituted an assertion by a Loan Party or an Affiliate of a Loan Party that the 2006 Main Term Loan UCC-1 had "cease[d]… to be in full force and

20

effect with respect to collateral with a book value in excess of $25,000,000 in the aggregate…" Term Loan Agreement, Article VII(g).

59.     The filing of the Adversary Proceeding on July 31, 2009 constituted an Event of Default pursuant to Article VII(g) of the Term Loan Agreement.

60.     JPMorgan had notice of that Event of Default on or about July 31, 2009, when it was notified by the Creditors Committee that the Adversary Proceeding had been filed.

61.     Pursuant to Section 8.05 of the Term Loan Agreement, when JPMorgan is notified of an Event of Default, it has an obligation "to give notice thereof to the Lenders" and to "take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders."

62.     Accordingly, JPMorgan was required by Section 8.05 of the Term Loan Agreement to give notice to the Plaintiff and the other Term Loan participants of the filing of, the pendency of, and the claims asserted in the Adversary Proceeding. That commenced on July 31, 2009 when the Adversary Proceeding was filed, and continued from July 31, 2009 to the present.

63.     In breach of its duties under the Term Loan, and its independent duties as an Agent to provide material information that JPMorgan had reason to know was needed by the Lenders to protect their interests, JPMorgan did not disclose, in mid-June 2009 or at any time since then, to the Plaintiff or the other

21

Term Loan participants that the Main Term Loan UCC-3 had been filed with the Delaware Department of State, or that the Creditors' Committee had challenged the validity of their security interest.

64.     Neither the Plaintiff nor, on information and belief, any of the other Term Loan participants was informed by JPMorgan, or anyone else, of the filing of or the pendency of the Adversary Proceeding at any time from its filing on July 31, 2009 through May 2015.

65.     The Plaintiff had no knowledge that the Adversary Proceeding had been filed and was pending against it until May 2015, when it was served with an Amended Complaint that had been filed in the Adversary Proceeding, as described below.

66.     On information and belief, none of the other Term Loan participants knew that the Adversary Proceeding had been filed and was pending against them until May 2015, when they were served with an Amended Complaint that had been filed in the Adversary Proceeding, as described below.

67.     On March 1, 2013, the Bankruptcy Court issued a decision in the Adversary Proceeding, in which it held that the filing of the Main Term Loan UCC-3 had not terminated the Term Loan security interest created by the 2006 Main Term Loan UCC-1. *See Official Comm. v. JPMorgan Chase Bank, NA (In re*

*Motors Liquidation Co.)*, 486 B.R. 596, 602 (Bankr. S.D.N.Y. 2013). However, the Creditors Committee appealed that decision to the Second Circuit.

68.     Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of the Bankruptcy Court's decision or the Creditors Committee's appeal of that decision.

69.     On June 7, 2014, the Second Circuit certified a question of law to the Delaware Supreme Court in connection with the Creditors Committee's appeal. Specifically, the Second Circuit asked the Delaware Supreme Court to decide whether,

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend to terminate the particular security interest that is listed on the UCC-3?

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d Cir. 2014).

70.     Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of the Second Circuit's certification of that legal question to the Delaware Supreme Court.

71.     On October 17, 2014, the Delaware Supreme Court held that

> [F]or a termination statement to become effective under § 9-509 and thus to have the effect specified in § 9-513 of the Delaware UCC, it is

enough that the secured party authorizes the filing to be made, which is all that § 9-510 requires. The Delaware UCC contains no requirement that a secured party that authorizes a filing subjectively intends or otherwise understands the effect of the plain terms of its own filing.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co.,* 103 A.2d 1010,

1017-18 (Del. 2014)

72.    In explaining its decision, the Delaware Supreme Court observed,

most aptly in light of the Defendant's grossly negligent conduct in this case:

> Before a secured party authorizes the filing of a termination statement, it ought to review the statement carefully and understand which security interests it is releasing and why. A secured party is master of its own termination statement; it works no unfairness to expect the secured party to review a termination statement carefully and only file the statement once it is sure that the statement is correct. If parties could be relieved from the legal consequences of their mistaken filings, they would have little incentive to ensure the accuracy of the information contained in their UCC filings.

*Id.* at 1016.

73.    Neither JPMorgan, nor anyone else, informed the Plaintiff or, on

information and belief, the other Term Loan participants of that decision of the

Delaware Supreme Court.

74.    On January 21, 2015, the Second Circuit issued its decision, reversing

the Bankruptcy Court's March 1, 2013 decision, and holding that the Term Loan

security interest had been terminated by the filing of the Main Term Loan UCC-3,

pursuant to JPMorgan's authorization. In so holding the Second Circuit said:

> JPMorgan and Simpson Thacher's repeated manifestations to Mayer

24

> Brown show that JPMorgan and its counsel knew that, upon the closing of the Synthetic Lease transaction, Mayer Brown was going to file the termination statement that identified the Main Term Loan UCC-1 for termination and that JPMorgan reviewed and assented to the filing of that statement. Nothing more is needed.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

75.     Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of that decision of the Second Circuit.

76.     As detailed herein, JPMorgan consistently and repeatedly breached its disclosure obligations under Section 8.05 of the Term Loan Agreement, and its independent duties as agent from July 31, 2009 to the present. It did so both by failing to provide the Plaintiff and the other Term Loan participants with required notices and by taking affirmative, purposeful actions to prevent the Plaintiff and the other Term Loan participants from learning that the security interest established by the 2006 Main Term Loan UCC-1 was being challenged and was impaired.

77.     On May 20, 2015, the Creditors Committee (now known as the Motors Liquidation Company Avoidance Trust) (the "Avoidance Trust") filed a First Amended Adversary Complaint in the Adversary Action (the "Amended Complaint"). JPMorgan, the Plaintiff, and all of the Term Loan participants that

received interest payments for the Term Loan from General Motors in May 2009 and/or received principal and interest payments for the Term Loan in or about July 2009 were named as the Defendants.

78.    In its Amended Complaint, the Avoidance Trust seeks to claw back from the Plaintiff the July 2009 principal and interest payment and the May 2009 interest payment that it received. The Avoidance Trust likewise seeks to claw back the July 2009 principal and interest payments and the May 2009 interest payments received by each of the other participants in the Term Loan.

79.    The Plaintiff was served with the Amended Complaint and Summons by counsel for the Avoidance Trust in late May or June 2015.  On information and belief most of the other Term Loan participants were also served around that time. This was the first notice that the Plaintiff, and on information and belief, the other Term Loan participants, had received that the security interest of the Term Loan established by the Main Term Loan UCC-3 had been challenged or had been lost.

**THE CLAIMS ASSERTED HEREIN HAVE BEEN TIMELY FILED**

80.    All of the claims asserted herein have been timely filed. To the extent that any of the claims asserted herein against the Defendants could be found to have accrued beyond the period set by any applicable statute of limitations, such limitations periods were tolled for multiple reasons, rendering those claims timely.

81.    *First*, all of the claims against the Defendants were tolled because the Plaintiff did not discover and could not with reasonable diligence have discovered the facts underlying the claims until late May or early June 2015, when it was served with the Amended Complaint in the Adversary Proceeding.

82.    As detailed herein, JPMorgan intentionally failed to, and did not, disclose to the Plaintiff and the other Term Loan participants that the Main Term Loan UCC-3 had been filed and that the Creditors Committee was challenging the continued viability of the 2006 Term Loan UCC-1 throughout the period from mid-June 2009 through May 2015.

83.    The Plaintiff and the other Term Loan participants were entitled to rely on their appointed agent for the Term Loan, JPMorgan, to preserve their security interests in the Team Loan and had no obligation to seek to discover what JPMorgan knew and was intentionally hiding from them.

84.    Having appointed JPMorgan as their agent to represent their interests on the Term Loan, for which JPMorgan was paid a fee as the Administrative Agent, the Plaintiff and other Term Loan participants had no separate duty to monitor the status of the security interests. To require them to monitor the security interests in the Term Loan, a task that they had already appointed JPMorgan to perform, would undermine the entire intent and purpose of the appointment of JPMorgan as Administrative Agent.

27

85.     *Second*, the claims against JPMorgan are also tolled by N.Y. C.P.L.R. § 206(b) because the Plaintiff and the other Term Loan participants are subject to a judgment against them (for return of the interest and principal payments they received in May and July 2009) as a result of the acts and omissions of their agent, JPMorgan. Because all claims against JPMorgan arise from JPMorgan's acts and omissions as agent for the Plaintiff and the other Term Loan participants, all claims against JPMorgan are tolled until judgment is entered against the Plaintiff and the other Term Loan participants.

86.     *Third*, JPMorgan is equitably estopped from asserting a statute of limitations defense to any claims against it. JPMorgan, *both* through its affirmative conduct *and* through its failure to disclose to Montgomery and the other participants in the Term Loan the facts regarding the release of the security interests, fraudulently concealed the facts underlying the claims against it.

87.     In order to avoid disclosure of the filing of the Main Term Loan UCC-3, JPMorgan entered into Stipulations with the Creditors Committee, which allowed the Creditors Committee to defer service of the Adversary Proceeding Complaint on Montgomery and the other participants in the Term Loan. This constituted affirmative conduct by JPMorgan to conceal the material information from the Plaintiff and the other Term Loan participants regarding the claims asserted here against JPMorgan.

88.     Furthermore, JPMorgan deliberately concealed the filing of the Main Term Loan UCC-3 and the release of the security interests, facts which JPMorgan had an affirmative duty to disclose to the Plaintiff and the other Term Loan participants. JPMorgan's deliberate breach of its duty to disclose provides additional and independent grounds for equitable estoppel. JPMorgan's affirmative duty to disclose arises from multiple sources:

a.  As detailed herein, the Term Loan Agreement created an affirmative duty requiring JPMorgan to notify the Lenders that the Creditors Committee claim was challenging the enforceability of the security interests in most of the collateral pledged to secure the Term Loan;

b.  As the agent for the Plaintiff and the other Term Loan participants, JPMorgan had an independent legal duty to disclose to the Plaintiff and the other Term Loan participants material information relevant to the affairs entrusted to JPMorgan, which JPMorgan knew the Plaintiff and the other Term Loan participants would desire to know, and which JPMorgan could have communicated without violating a superior duty to a third party;

c.  As the agent for the Plaintiff and the other Term Loan participants, JPMorgan had independent legal duties specifically to (i) notify the Plaintiff and the other Term Loan participants that JPMorgan had

acted beyond its actual authority by releasing the security interests on the Term Loan and (ii) advise the Plaintiff and the other Term Loan participants on the courses of action reasonably available to the Plaintiff and the other Term Loan participants in light of the actions of JPMorgan, Mayer Brown, and Simpson Thacher, as detailed herein;

d. JPMorgan possessed superior knowledge, not readily available to the Plaintiff and the other Term Loan participants, and JPMorgan knew that the Plaintiff and the other Term Loan participants were acting or refraining from acting on the basis of that lack of knowledge, which gave rise to a legal duty for JPMorgan to provide the relevant, material information to the Plaintiff and the other Term Loan participants;

e. There was an inherent secrecy in JPMorgan's conduct, given that the Plaintiff and the other Term Loan participants specifically relied upon JPMorgan as their agent to act on their behalf in connection with the Term Loan, which gives rise to a duty to disclose; and

f. When JPMorgan provided partial information at the time of the July 2009 principal and interest distribution, JPMorgan was obligated to provide complete disclosure about the potential claw back.

89.     Furthermore, the Plaintiff has filed this action within a reasonable time after discovering the facts underlying its claim. As noted, the Plaintiff first learned of the release of the Term Loan security interests in late May or early June 2015, and it has promptly filed this suit approximately two months after that discovery. Therefore, JPMorgan is equitably estopped from asserting that the claims asserted against it are untimely.

90.     **Fourth**, all claims against JPMorgan are additionally tolled by the continuing representation doctrine. JPMorgan, the Plaintiff and the other Term Loan participants had a continuing relationship as agent and principal in connection with the Term Loan, and JPMorgan purported to act on behalf of the Plaintiff and the other Term Loan participants throughout the Adversary Proceeding in the Bankruptcy Court, the Second Circuit and the Delaware Supreme Court. Claims against JPMorgan were tolled during its ongoing representation of the Plaintiff and the other Term Loan participants.

91.     Even if the Plaintiff and the other Term Loan participants had been notified of the Adversary Proceeding (as noted, they were not so notified), they would have been entitled to rely upon JPMorgan's continuing representation of their interests.  Specifically,

a.     The Plaintiff and the other Term Loan participants in the Term Loan specifically appointed JPMorgan to act on their behalf and had an ongoing

31

relationship with JPMorgan, and thus should not have been required to sue JPMorgan while JPMorgan was still litigating the interests of the Plaintiff and the other Term Loan participants in the Adversary Proceedings; and

b.      Because the Plaintiff and the other Term Loan participants entrusted JPMorgan as their agent to preserve the security interests for the Term Loan on their behalf, there was a relationship of trust between the Plaintiff and the other Term Loan participants and JPMorgan.

## CLASS ALLEGATIONS

92.     Pursuant to Rule 23(a) and (b)(1), (2) and (3) of the Federal Rules of Civil Procedure, Plaintiff brings this complaint on behalf of itself and all other Term Loan participants that received interest payments for the Term Loan from General Motors in May 2009 and/or received principal and interest payments for the Term Loan on or about July 2009 (the "Class"). Excluded from the Class are the defendant JPMorgan and any of its affiliates.

93.     Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the definition of the Class.

94.     There are several hundred members of the Class.

95.     Plaintiff's claims raise questions of law and fact that are common to each member of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

a.  Whether JPMorgan breached the Term Loan Agreement by authorizing the filing of the Main Term Loan UCC-3 that released substantially all of the Collateral for the Term Loan without the consent of each Lender.

b.  Whether JPMorgan breached its duty to Plaintiff and the Class in performing its duties as Administrative Agent under the Term Loan, including when it authorized the filing of the Main Term Loan UCC-3.

c.  Whether JPMorgan acted recklessly and was grossly negligent when it authorized the filing of the Main Term Loan UCC-3.

d.  Whether JPMorgan breached its duty to Plaintiff and the Class and violated the Term Loan Agreement by failing to inform the Plaintiff and Class that the Main Term Loan UCC-3 had been filed with the Delaware Department of State and that the Creditors Committee had asserted that the security interest of Plaintiff and the Class was no longer valid.

e.  Whether JPMorgan fraudulently concealed from the Plaintiff and the Class that the Main Term Loan UCC-3 had been filed with the Delaware Department of State and that the Creditors Committee had

asserted that the security interest of Plaintiff and the Class was no longer valid.

f.   Whether Simpson Thacher owed a duty to Plaintiff and the Class, independently and/or as a result of its duties to JPMorgan, in connection with its review and approval of the closing documents for the Synthetic Lease including the Term Loan UCC-3.

g.   Whether Simpson Thacher acted negligently and was grossly negligent in its review and approval of the closing documents for the Synthetic Lease, and in particular its review and approval of the Term Loan UCC-3.

h.   Whether Simpson Thacher made negligent misrepresentations with respect to the Synthetic Lease closing documents and, in particular, with respect to the inclusion therein of the Term Loan UCC-3.

96.   The claims of Plaintiff are typical of the claims of each member of the Class. Plaintiff alleges a common set of facts and theories of recovery against Defendants relating to the Term Loan and the course of conduct that led to the release of the Class members' security interest in the Term Loan through the filing of the Term Loan UCC-3 with the Delaware Department of State. Plaintiff and the Class seek identical remedies under identical legal theories based on identical

factual occurrences. There is no antagonism or factual variation between Plaintiff's claims and those of the Class.

97.    Plaintiff will fairly and adequately protect and represent the interest of each member of the Class.  Plaintiff is fully cognizant of its responsibilities as class representative and has retained experienced counsel fully capable of, and intent upon, vigorously prosecuting this action on behalf of the Class.

98.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b) and in consideration of the matters set forth in Rule 23(b)(3)(A)-(D).  The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of the Class.

99.    As alleged herein, Defendants have acted or refused to act on grounds that apply to the entirety of the Class such that final injunctive or declaratory relief is appropriate respecting the Class as a whole.

100.    Prosecuting separate actions by individual Class members would create a risk of (a) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class, or (b) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the

other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**CLAIMS FOR RELIEF**

**COUNT I**

**BREACH OF CONTRACT – AGAINST JPMORGAN**

101.   The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

102.   By reason of the conduct alleged herein, JPMorgan is liable to the Plaintiff and the other Term Loan participants for its breaches of the Term Loan Agreement.

103.   Pursuant to Section 8.01 of the Term Loan Agreement, each Lender designated and appointed JPMorgan as the agent of such Lender, and each such Lender authorized JPMorgan, as the agent for such Lender, "to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto."

104.   Under Section 10.01(vii) of the Term Loan Agreement, JPMorgan had no authority to "release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender."

36

105.   JPMorgan breached the Term Loan Agreement by authorizing General Motors to file the Main Term Loan UCC-3, which released substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender.

106.   The Exculpatory Provisions of the Term Loan Agreement do not insulate JPMorgan from liability for the foregoing breaches because:

    a.   JPMorgan's actions, which were not authorized and went beyond the scope of its authority under the Term Loan Agreement, were not an "action lawfully taken" by JPMorgan;

    b.   JPMorgan acted with reckless indifference to the interests of the Plaintiff and the other participants in the Term Loan, and therefore was grossly negligent.

107.   Under Article VII(g) and Section 8.05 of the Term Loan Agreement, JPMorgan has a continuous duty to inform the Lenders and take direction given by a majority of them, if "any of the Security Documents shall cease, for any reason, to be in full force and effect with respect to Collateral with a book value in excess of $25,000,000 in the aggregate, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby," which constituted an Event of Default under the Term Loan.

108.   In breach of these obligations, JPMorgan did not inform the Plaintiff, or, on information and belief, the other Term Loan participants that on July 31 2009, the Creditors Committee asserted that the Security Documents with respect to Collateral with a book value in excess of $25,000,000 in the aggregate had ceased to be in full force and effect.

109.   The Exculpatory Provisions of the Term Loan Agreement do not insulate JPMorgan from liability for the foregoing breaches because JPMorgan acted willfully, intentionally, recklessly and in a grossly negligent matter when it concealed this information from the Term Loan participants so that they would not learn about its misconduct.

110.   The Plaintiff and the other Term Loan participants were injured and damaged as a direct and proximate result of JPMorgan's breaches of contract.

111.   JPMorgan breached its disclosure obligations in the Event of Default, which deprived the Plaintiff and the other participants in the Term Loan of their opportunity under the Term Loan Agreement to instruct JPMorgan as to what action to take against Mayer Brown, Simpson Thacher and JPMorgan itself. As a result, JPMorgan had the obligation, without instructions from a majority of the participants in the Term Loan, to take all reasonable steps to ensure that any statutes of limitations on any claims that could be asserted against Mayer Brown, Simpson Thacher and JPMorgan itself,  arising out of the conduct and events

described herein, would not expire.  This could have included, but not have been limited to, entering into tolling agreements with Mayer Brown, Simpson Thacher and JPMorgan itself, which tolled the running of the statute of limitations or bringing those claims prior to any possible expiration of any applicable statutes of limitations.  Plaintiff does not know if any such tolling agreements have been entered into.  Any failure by JPMorgan to meet the obligations described herein constitute further damages caused by the JPMorgan's breach of contract.

## COUNT II

## GROSS NEGLIGENCE – AGAINST JPMORGAN

112.  The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

113.  By reason of the conduct alleged herein, JPMorgan is liable to the Plaintiffs and the other Term Loan participants for its gross negligence.

114.  Defendant JPMorgan, as a legal entity which made a contract to perform services as an agent, owed a duty to the Plaintiff and the other Term Loan participants to act in accordance with its contractual undertakings.

115.  By authorizing General Motors to file the Main Term Loan UCC-3, which released substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender, JPMorgan breached its duty to act in accordance with its contractual undertaking, and instead acted with

reckless indifference to the rights of the Plaintiff and the other Term Loan participants in performing its duties as an agent under the Term Loan.

116.   Defendant JPMorgan further breached its duties to act in accordance with its contractual undertakings by failing to inform the Plaintiff and the other Term Loan participants that the Main Term Loan UCC-3 had been filed with the Delaware Department of State and that the Creditors Committee had asserted that the Security Interest was no longer valid.  In so doing, JPMorgan intentionally concealed information in order to prevent the Plaintiff and the other Term Loan participants from learning about its misconduct and its grave consequences, or acted with reckless indifference to the rights of the Plaintiff and the other Term Loan participants.

117.  JPMorgan owed a duty to the Plaintiff and the other Term Loan participants to take action only within the scope of its actual authority as agent and to comply with all lawful instructions received from the participants in the Term Loan.

118.  JPMorgan took actions beyond the scope of its actual authority as agent, and in contravention of the lawful instructions of the participants in the Term Loan, when it authorized General Motor to file the Main Term Loan UCC-3, which released substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender.

119.   As a result of the actions taken beyond the scope of its authority and in contravention of the lawful instructions of the participants in the Term Loan, JPMorgan is liable to the Plaintiff and the other Term Loan participants for losses caused by its unauthorized actions, including any loss to the principal that stems from actions taken by JPMorgan with apparent authority, on the basis of which the Plaintiff and the other participants in the Term Loan became subject to liability to the Creditors' Committee.

120.   Defendant JPMorgan, as a paid agent, owed a duty to the Plaintiff and the other participants in the Term Loan to act with due care and with the skill which is standard in the locality for the kind of work which he is employed to perform and, in addition, to exercise any special skill that it has.

121.   By authorizing General Motors to file the Main Term Loan UCC-3, which released substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender, JPMorgan breached its duty to act with due care, and instead acted with reckless indifference to the rights of the Plaintiff and the other Term Loan participants.

122.   JPMorgan owed a duty to the Plaintiff and the other Term Loan participants to disclose information relevant to the affairs entrusted to JPMorgan, which JPMorgan knew the Plaintiff and the other Term Loan participants would

desire to have, and which JPMorgan could have communicated without violating a superior duty to a third party.

123.   JPMorgan breached the foregoing duties by failing to inform the Plaintiff and the other Term Loan participants that the Main Term Loan UCC-3 had been filed with the Delaware Department of State and that the Creditors Committee had asserted that the Security Interest was no longer valid.  In so doing, JPMorgan intentionally concealed information in order to prevent the Plaintiff and the other Term Loan participants from learning about its misconduct and its grave consequences, or acted with reckless indifference to the rights of the Plaintiff and the other Term Loan participants.

124.   In allocating the potential risk of loss, the Term Loan Agreement expressly contemplates that JPMorgan can be held liable for its "own gross negligence or willful misconduct."

125.   The Plaintiff and the other Term Loan participants were injured by JPMorgan's reckless and grossly negligent breaches of the foregoing duties, and their injuries were the foreseeable and expected result of those breaches.

126.   The Plaintiff and the other Term Loan participants were damaged as a direct and proximate result of JPMorgan's reckless and grossly negligent breaches of the foregoing duties.

## COUNT III

## FRAUDULENT CONCEALMENT – AGAINST JPMORGAN

127.   The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

128.   By reason of the conduct alleged herein, JPMorgan is liable to the Plaintiff and the other participants in the Term Loan for fraudulent concealment.

129.   JPMorgan learned sometime in the middle of June 2009, from its attorneys at Morgan Lewis, that the Main Term Loan UCC-3 had been filed with the Delaware Department of State, and that the lenders' Security Interest in the collateral for the term loan was potentially impaired.

130.   JPMorgan did not disclose this material information to the Plaintiff or, on information and belief, to the other Term Loan participants when in July 2009 JPMorgan repaid the lenders 100% of the principal amount of their loans.  By distributing the loan proceeds without disclosing that the payment may be subject to being clawed-back, JPMorgan omitted material information needed to make the partial disclosure that was made complete.

131.   On July 31, 2009, the Creditors Committee commenced an Adversary Proceeding against JPMorgan, claiming that the security interest in General Motor's property under the Term Loan had been terminated by the October 2008 filing of the Main Term Loan UCC-3.

132.   The Plaintiff and the other Term Loan participants were named as Defendants in the Adversary Proceeding.  However, in order to avoid disclosure that the Main Term Loan UCC-3 had been filed and that the Lenders' security interests were potentially impaired, JPMorgan entered into a Stipulation with the Creditor's Committee allowing the Creditor's Committee to defer service of the Adversary Proceeding Complaint, thereby engaging in further affirmative steps to conceal this material information from the Plaintiff and the other Term Loan participants.

133.   JPMorgan acted with full knowledge and intent, and was motivated by its interest in protecting itself from the legal consequences of its misconduct.

134.   JPMorgan had a duty to disclose the concealed material information because:

> a. The Term Loan agreement obligated JPMorgan to notify the Plaintiff and the other Term Loan participants about the claim that had been made by the Creditors' Committee challenging the enforceability of the Security Interest in most of the collateral pledged to secure the Term Loan;
>
> b.  As an agent, JPMorgan had an independent legal duty to disclose to the participants in the Term Loan, information relevant to the affairs entrusted to JPMorgan, which JPMorgan knew the Plaintiff and the

44

other Term Loan participants would desire to have, and which JPMorgan could have communicated without violating a superior duty to a third party;

c. JPMorgan possessed superior knowledge, not readily available to the Plaintiff and the other Term Loan participants, and knew that the Plaintiff and the other Term Loan participants were acting or refraining to act on the basis of that mistaken knowledge; and

d. By providing partial information at the time of the distribution in July, 2009, JPMorgan was obligated to provide complete disclosure about the potential claw back.

135.   The Plaintiff and the other Term Loan participants were lulled into inaction by JPMorgan's deliberate silence, notwithstanding its duty to disclose, and justifiably relied on the non-disclosures to their substantial detriment.

136.   The Plaintiff and the other Term Loan participants were damaged as a direct and proximate result of JPMorgan's fraudulent concealment.

137. As a direct and proximate result of JPMorgan's fraudulent concealment, the Plaintiff and the other Term Loan participants were unaware of the claims they could assert against JPMorgan, Mayer Brown and Simpson Thacher, and hence, if any statute of limitations has expired, were unable to and prevented from asserting those claims.

45

138.   JPMorgan fraudulently concealed from the Plaintiff and the other participants in the Term Loan, which deprived them of their opportunity under the Term Loan Agreement to instruct JPMorgan as to what action to take against Mayer Brown, Simpson Thacher and JPMorgan itself. As a result, JPMorgan had the obligation, without instructions from a majority of the participants in the Term Loan, to take all reasonable steps to ensure that any statutes of limitations on any claims that could be asserted against Mayer Brown, Simpson Thacher and JPMorgan itself,  arising out of the conduct and events described herein, would not expire.  This could have included, but not have been limited to, entering into tolling agreements with Mayer Brown, Simpson Thacher and JPMorgan itself, which tolled the running of the statute of limitations or bringing those claims prior to any possible expiration of any applicable statutes of limitations.  Plaintiff does not know if any such tolling agreements have been entered into.  Any failure by JPMorgan to meet the obligations described herein constitute further damages caused by the JPMorgan's fraudulent concealment.

139.   If it should be found that any of the other claims asserted against JPMorgan, Simpson Thacher, or Mayer Brown, are untimely due to the expiration of any applicable statute of limitations, then the damages directly and proximately caused by JPMorgan's fraudulent concealment will include the damages the Plaintiff and the members of the Class could have and would have recovered from

46

JPMorgan, Simpson Thacher and Mayer Brown on the claims found to have been untimely filed.

## COUNT IV

## AGAINST JPMORGAN FOR DECLARATORY RELIEF AS TO JPMORGAN'S COMMON LAW INDEMINIFICATION OBLIGATIONS

140.   The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

141.   The Plaintiff and the Class members, as lenders of the Term Loan, received disbursements as purported secured creditors for repayments of principal and interest under the terms of the Term Loan Agreement.

142.   Following the decision of the United States Court of Appeals for the Second Circuit, however, a legal action has been instituted before the United States Bankruptcy Court for the Southern District of New York ("the bankruptcy court") in which the Plaintiff and the Class Members are being sued for repayment to the General Motors bankruptcy estate of all such disbursements of principal and interest that the Plaintiff and the Class members received under the Term Loan.

143.   The suit pending before the bankruptcy court is premised on the Second Circuit's ruling that the Plaintiff and the Class members were all actually unsecured creditors due to the 2008 release of the 2006 Main Term Loan UCC-1.

144.   The allegation and basis for the demand for repayment levied against the Plaintiff and the Class members is that they and JPMorgan committed a wrong on the General Motors bankruptcy estate and the unsecured creditors by taking payments as secured creditors when, in fact, the Plaintiff and the Class members were unsecured creditors that were, therefore, not entitled to such priority of repayment.

145.   The alleged wrong by which the Plaintiff and the Class Members obtained payment from the General Motors bankruptcy estate, however, was brought about and caused by JPMorgan's wrongful action in wrongfully and in contravention of contractual obligations owed to the Plaintiff and the Class members, releasing the lien securing the Plaintiff's and the Class members' interest as lenders under the Term Loan.

146.   Despite its obvious wrongful conduct, JPMorgan has failed to assume responsibility for any repayment of principal and/or interest that is being sought against the Plaintiff and the Class members, even though any such repayment obligations would have been caused by JPMorgan's wrongful conduct.

147.   Due to the pending lawsuit against the Plaintiff and the Class members for repayment of any principal and interest they have received under the Term Loan, and given JPMorgan's refusal to assume responsibility or any obligation for such repayment, a live controversy exists as to the rights of the

Plaintiff and the Class members to obtain indemnification from JPMorgan for any repayment of principal, interest, and any other fees or costs, that they may be required to make as a result of the pending legal proceeding against them.

148.   The Plaintiff and the Class members, therefore, have standing to and do seek a declaratory judgment from this Court, declaring that due to JPMorgan's wrongful conduct in causing Plaintiff and the Class members' lien securing the Term Loan to be erroneously released in grossly negligent fashion, JPMorgan is and will continue to be liable to Plaintiff and the Class members for indemnification of any amounts that Plaintiff and the Class members will have to pay as a result of any resolution or disposition of the legal proceeding before the bankruptcy court.

## COUNT V

## MALPRACTICE AND PROFESSIONAL NEGLIGENCE AGAINST SIMPSON THACHER

149.   The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

150.   Defendant Simpson Thacher assumed professional responsibility for representing JPMorgan, which was the agent for and representative of the lenders in the Synthetic Lease and the Term Loan. Simpson Thacher undertook to exercise its professional skill and talent on behalf of and/or for the benefit of JPMorgan, and

had a duty to exercise professional competence and due professional care in doing so. Simpson Thacher owed this duty to JPMorgan, and because JP Morgan was in its capacity as agent for Plaintiffs, Simpson Thacher also owed the same duty to the syndicate of lenders for whom JPMorgan was serving as Administrative Agent.

151.   From reviewing the Lease Payoff closing checklist, escrow letter, and UCC termination statements, Simpson Thacher knew that JP Morgan, as Secured Party, was acting as Administrative Agent for a syndicate of lenders.

152.   In reviewing the Lease Payoff closing checklist, escrow letter, and UCC termination statements, Simpson Thacher had a duty to JPMorgan, and to Plaintiffs as JPMorgan's principals, to use due professional care.

153.   Simpson Thacher failed to exercise professional competence and due professional care by negligently, grossly negligently, and recklessly approving and authorizing the filing of the Main Term Loan UCC-3.

154.   Furthermore, Simpson Thacher failed to conduct proper due diligence and failed to properly review the closing checklist, escrow letter, and UCC termination statements.

155.   As a direct and proximate result of Simpson Thacher's professional negligence and/or gross negligence, the Term Loan participants lost substantially all of the security interest under the Term Loan, and thereby suffered damages in an amount to be proven at trial.

## COUNT VI

## NEGLIGENT MISREPRESENTATION AGAINST SIMPSON THACHER

156.   The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

157.   Defendant Simpson Thacher assumed professional responsibility for representing JPMorgan, Plaintiff, and the members of the Class, with respect to the transactions alleged herein. Simpson Thacher undertook to exercise its professional skill and talent on behalf of and/or for the benefit of JPMorgan, Plaintiff and the members of the Class, and had a duty to exercise professional competence and due professional care in doing so.

158.   Simpson Thacher knew that JPMorgan would rely on its review and approval of the closing documents and Escrow Agreement for the Synthetic Lease.

159.   Simpson Thacher knew, or but for its negligent and grossly negligent legal work, should have known, that the 2006 Main Term Loan UCC-1 and Main Term Loan UCC-3, bore no relationship to the they Synthetic Lease, and that it was inappropriate to release the 2006 Main Term Loan UCC-1 in connection with the pay-off of the Synthetic Lease.

160.   Because Simpson Thacher was in privity with JPMorgan, and knew that JPMorgan was acting as Administrative Agent for a syndicate of lenders, JP

Morgan had a relationship with the Plaintiff and the Class that approached privity, and gave rise to a duty that barred it from making negligent misrepresentations.

161.   Simpson Thacher negligently misrepresented to JPMorgan, and through JPMorgan, the Plaintiff and the Class, that the closing documents and Escrow Agreement for the Synthetic Lease were "fine," when, in fact, they were grossly deficient since they contained the Main Term Loan UCC-3.

162.   Simpson Thacher failed to investigate and review with reasonable care the information contained in the Lease Payoff closing checklist, the escrow letter, and the Main Term Loan UCC-3.

163.   Simpson Thacher breached the duty to use reasonable care by approving and authorizing the Lease Payoff documents and representing that they were "fine," when, in fact, they contained massive errors.

164.   Simpson Thacher knew and intended that JPMorgan, and through JPMorgan, the Plaintiff and the Class, would rely on its representations regarding the Synthetic Lease closing documents and Escrow Agreement.

165.   As a direct, foreseeable, and proximate result of Simpson Thacher's negligent misrepresentations, upon which they justifiably relied, the Plaintiff and other Term Loan participants lost substantially all of their security interest under the Term Loan, and thereby suffered damages in an amount to be proven at trial.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff, on its own behalf and on behalf of the members of the Class, respectfully requests:

A.     That that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 (a) and (b)(1), (2) and (3) and appoint Plaintiff as the representative of the Class, and its counsel as counsel for the Class;

B.     that the Court enter judgment awarding actual damages to Plaintiff and the Class against all of the Defendants in an amount to be determined at trial together with prejudgment and post-judgment interest at the maximum rate allowed by law;

C.     that the Court award appropriate and reasonable attorneys' fees and expenses and the costs of this suit;

D.     that the Court enter the appropriate declaratory relief to which Plaintiff and the Class are entitled; and

E.     that the Court award such other and further relief as it may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of the Class, demands a trial by jury on all claims and issues so triable.

Dated:  July 30, 2015

By its attorneys,

/s/ Thomas V. Urmy, Jr.
Thomas V. Urmy, Jr.
Edward F. Haber
Michelle H. Blauner
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, Massachusetts  02210
Tel: (617) 439-3939
turmy@shulaw.com
ehaber@shulaw.com
mblauner@shulaw.com

Bobby Segall
COPELAND FRANCO PA
444 South Perry Street
Montgomery, Alabama 36101
Tel: (334) 834-1180
segall@copelandfranco.com

Roy Katriel
THE KATRIEL LAW FIRM PC
4224 Executive Square, Suite 600
La Jolla, California 92037
Tel: (858) 242-5642
rak@katriellaw.com

**Counsel for Plaintiff and the Class**